# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| GREGORY W. MOORE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 3:18-00364 |
| | ) | **Judge Campbell/Brown** |
| NANCY A. BERRYHILL, ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable William L. Campbell, Jr., United States District Judge.**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration (SSA) through its Commissioner denying plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 416(I) and 423(d). For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 18) be **DENIED** and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY[1]

Plaintiff filed an application for DIB on November 10, 2014 alleging a disability onset date of June 1, 2008. Plaintiff alleged disability due to back pain, depression, anxiety, enlarged aorta, heart valve repair, and arthritis. (Doc. 14, pp. 163, 167) Plaintiff's application was denied initially on August 13, 2015 and upon reconsideration on November 9, 2015.

---

[1] The procedural history below is adopted from the Jurisdiction and Procedural History section (Doc. 14, p. 93) of the Administrative Law Judge's (ALJ) June 14, 2017 decision (Doc. 14, pp. 90-107) unless otherwise indicated. References to page numbers in the administrative record are to the numbers that appear in bold in the lower right corner of each page.

Plaintiff requested a hearing before an ALJ on December 29, 2015. A hearing was held before ALJ William O. Gray on April 5, 2017. Plaintiff was represented at the hearing by attorney Mark Stewart. Vocational expert (VE) Rodney Caldwell, Ph.D., testified at the hearing.

The ALJ entered an unfavorable decision on June 14, 2017 (Doc. 14, pp. 90-107), after which plaintiff filed a request with the Appeals Council on August 10, 2017 to review the ALJ's decision (Doc. 14, p. 36). The Appeals Council denied plaintiff's request. (Doc. 14, pp. 1-5)

Plaintiff brought this action through counsel on April 12, 2018. (Doc. 1) Thereafter, plaintiff filed a motion for judgment on the administrative record on August 30, 2018 (Doc. 18) and defendant responded on September 21, 2018 (Doc. 21). Plaintiff did not file a reply. This matter is now properly before the court.

## II. EVIDENCE

### A. Medical Evidence[2]

Plaintiff underwent cardiac catheterization at the Southern Tennessee Medical Center on November 30, 2010 that revealed a "[m]itral valve prolapse with severe mitral regurgitation."[3] (Doc. 14, pp. 373-74) Dr. Stephen Ball, M.D., Vanderbilt University Medical Center (VUMC), performed "[m]inimally-invasive mitral valve repair" on April 8, 2011. (Doc. 14, p. 331) Plaintiff was discharged from the hospital on April 12, 2011 and referred to cardiac rehabilitation (Doc. 14, pp. 319-21). A May 17, 2011 VUMC "Post Op Note" reported the presence of cardiac palpitations but the report was otherwise unremarkable. (Doc. 14, p. 348)

---

[2] The medical evidence of record (MER) and non-medical documentary evidence are discussed below to the extent necessary to address plaintiff's claims of error. The remainder of the evidence of record is incorporated herein by reference.

[3] Mitral – "pertaining to the left atrioventricular ['both an atrium and ventricle of the heart'] valve." *Dorland's Illustrated Medical Dictionary* 176, 1188 (31st ed. 2007). Prolapse – "the falling down, or sinking, of a part . . . ." *Dorland's* at 1540. Regurgitation – "flow in the opposite direction from normal, as the backward flowing of blood into the heart or between heart chambers." *Dorland's* at p.1645.

2

The progress notes of cardiologist, Dr. Mircea Basaraba, M.D., Southern Tennessee Cardiology, are before the court for the period November 22, 2010 to October 27, 2016.[4] (Doc. 14, pp. 349-85, 581-83, 739-70) Dr. Basaraba saw plaintiff on May 25 and June 9, 2011 and reported that he complained of palpitations and tachycardia, but not dizziness or syncope.[5] (Doc. 14, pp. 354, 357) Dr. Basaraba ordered a 24-hour Holter monitor, and reported later that "Holter monitoring did not reveal any significant arrhythmias"[6] (Doc. 14, pp. 354, 357)

Plaintiff complained of palpations and tachycardia on January 17, 2012, "but no dizziness or syncope," "dyspnea[7] with minimal physical activity," and "left-side chest pain . . . with physical activity, with radiation to the base of the neck and left shoulder" suggesting angina.[8] (Doc. 14, p. 359) Dr. Basaraba ordered a nuclear stress test and an echocardiogram.[9] (Doc. 14, pp. 359, 361) Plaintiff had the same complaints on August 13, 2012 and Dr. Basaraba ordered the echocardiogram repeated. (Doc. 14, p. 362) On September 10, 2012, Dr. Basaraba characterized the results of the repeat echocardiogram as follows: "Normal left ventricle systolic function ejection fraction is 62%. Mild left ventricular diastolic dysfunction. Severe eccentric left ventricular hypertrophy. Dilated

---

[4] The record shows that Dr. Basaraba was plaintiff's cardiologist for at least six years, that he was the doctor who performed the November 30, 2010 cardiac catheterization (Doc. 14, pp. 373-74), that he was plaintiff's cardiologist at the time of the April 5, 2017 hearing and that he saw him on a "regular basis" (Doc. 14, p. 122).

[5] Tachycardia – "excessive rapidity in the action of the heart . . . ." *Dorland's* at 1890. Syncope – "a temporary suspension of consciousness due to generalized cerebral ischemia ['deficiency of blood . . . usually due to functional constriction or actual obstruction of a blood vessel']; also called a faint." *Dorland's* at 975, 1845

[6] Holter monitor – "ambulatory ECG monitor." *Dorland's* at 1194. Arrhythmia – "a disturbance in or loss of regular rhythm . . . especially . . . from the normal rhythm of the heartbeat . . . ." *Dorland's* at 135.

[7] Dyspnea – "breathlessness or shortness of breath . . . ." *Dorland's* at 589.

[8] Angina – "a paroxysmal ['recurrence or intensification of symptoms . . a spasm or seizure'] thoracic ['pertaining to the . . . chest'] pain . . . sometimes accompanied by a feeling of suffocation . . . ." *Dorland's* at 84, 1405, 1945.

[9] The laboratory reports of these tests are not in the record.

3

ascending aorta. Mild mitral regurgitation.  Mild aortic regurgitation."[10]  (Doc. 14, p. 366)  Dr. Basaraba saw plaintiff again on March 22, 2013.  (Doc. 14, p. 370-72)  Plaintiff complained of "occasional episodes of paroxysmal dyspnea which could represent atypical angina."  (Doc. 14, p. 370)  Dr. Basaraba ordered yet another nuclear stress test and echocardiogram.[11]  (Doc. 14, pp. 370, 372)

Dr. Basaraba saw plaintiff next on April 11, 2016.  (Doc. 14, pp. 752-54)  The April 11th progress note refers to the two prior nuclear stress tests, both of which were unremarkable, and the two prior EKGs, both of which noted only that the ascending aorta was mildly "dilated at 4.1 cm." Dr. Basaraba ordered another nuclear stress test, an EKG and a Holter monitor on April 11th.  (Doc. 14, p. 752)  Dr. Basaraba reported on April 14, 2016 that the results of the nuclear stress test and Holter monitor were unremarkable and that the EKG showed that plaintiff's mitral valve repair was functioning normally.  (Doc. 14, pp. 747, 750)  On April 21, 2016, Dr. Basaraba reported that a 24-hour Holter monitor revealed "no significant arrhythmias."  (Doc. 14, p. 743)  Dr. Basaraba reported on October 27, 2016 that plaintiff was "doing well [on] current medication without symptoms . . . ."  (Doc. 14, pp. 740-42)

The clinical records of psychiatrist Dr. David T. Holmes, M.D., Tullahoma Psychiatric Services, are before the court for the period February 6, 2013 to May 6, 2016.  (Doc. 14, pp. 386-95, 414-20, 599-619)  Dr. Holmes' clinical records show that plaintiff experienced some ups and downs during the course of his treatment but, during the period November 2014 through May 2016, Dr.

---

[10] Systolic – pertaining to . . . or . . . occurring during [contraction] . . . ." *Dorland's* at 1888. Ejection fraction is the "measurement of the percentage of blood leaving [the] heart each time it contracts."  A left ventricle "ejection fraction of 55 percent or higher is considered normal." Mayoclinic.org. Diastolic – the phase of the heartbeat when the heart muscle relaxes and allows the chambers to fill with blood. *Dorland's* at 518. Eccentric – "situated or occurring away from a center." *Dorland's* at 595. Hypertrophy – "the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells." *Dorland's* at 910.

[11] The laboratory reports of these tests are not in the record.

4

Holmes reported that plaintiff was "doing well with the current psychiatric medication" (Doc. 14, pp. 600, 606-09, 612), adding during the period March 2014 through May 2016 that plaintiff was managing ADLs "better" or "without significant difficulties" (Doc. 14, pp. 390-91, 417-20, 600, 604, 607, 609, 612, 618-19). Dr. Holmes also reported repeatedly that "[t]here is no hopelessness or evidence of suicidal thinking." (Doc. 14, pp. 388-94, 415-20, 600, 602-11, 614, 616-18)

The records of Tennessee Anesthesia-Pain Management Services (Pain Management Services) are before the court for the period April 19, 2013 to February 28, 2017. (Doc. 14, pp. 396-413, 436-556, 620-97, 771-816) Anesthesiologist Dr. Charles Harmuth, M.D., prescribed lumbar epidural steroid injections, massage, and physical therapy including electrical stimulation, and ultrasound during plaintiff's initial intake evaluation. (Doc. 14, p. 520) The Pain Management Services' records during the period July through September 2016 show that plaintiff was "doing well w/meds" (Doc. 14, pp. 800, 803, 806) and on January 31, 2017 that plaintiff was "[d]oing well with meds which allow him to do ADLs" (Doc. 14, p. 779).

Plaintiff presented to Tennova Neurology – Tullahoma (Tennova) on April 13, 2015 for an "episode" that occurred two months earlier, in February 2015. (Doc. 14, pp. 736-38) Dr. Raymond Capps, M.D., determined – in relevant part – that plaintiff had experienced a drug withdrawal seizure after he stopped taking Xanax the week prior to the "episode." (Doc. 14, p. 737) Dr. Capps' clinical record shows that plaintiff's physical and neurological examinations were normal, as were plaintiff's labs and CT scan of the head. (Doc. 14, pp. 736-37)

Centerstone records are before the court for the period April 17, 2015 to March 20, 2017.[12] (Doc. 14, pp. 557-80, 698-713, 817-844) Licensed Clinical Social Worker (LCSW) Connie Work was plaintiff's assigned clinician during his treatment at Centerstone. LCSW Work completed a

---

[12] The records before the court show that plaintiff sought treatment at Centerstone "initially because his attorney told him to [go] . . . ." (Doc. 14, p. 564)

Clinical Intake Assessment on April 17, 2015 (Doc. 14, pp. 557-63) pursuant to which she diagnosed plaintiff with "[m]ajor depressive disorder, [s]ingle episode, [s]evere . . . [and] . . . [g]eneralized anxiety disorder" (Doc. 14, p. 561). LCSW Work noted at the time that there were no "firearms present in the home." (Doc. 14, p. 559) Thereafter, LCSW Work reported "[n]o SI [suicidal ideations] . . . present" repeatedly in her progress notes. (Doc. 14, pp. 564, 567, 570, 702, 826, 828, 835, 839, 842) She also completed Columbia-Suicide assessment on September 11, 2015 and again on January 12, 2017 (Doc. 14, pp. 578-580, 823-25) noting on both occasions that plaintiff represented he never wished he were dead, never wished he could just go to sleep and not wake up, and that he never had any thoughts of killing himself (Doc. 14, pp. 578, 823).

On November 6, 2015, Dr. Jayne Dubois, Ph.D., determined upon reconsideration that plaintiff's alleged mental limitations did not satisfy the A, B, or C criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1 (Subpart P). (Doc. 14, p. 151) Dr. Dubois also determined, among other things, that plaintiff had only mild ADL limitations and mild limitations in maintaining concentration, persistence or pace. (Doc. 14, p. 151)

Plaintiff presented to TrustPoint Hospital (TrustPoint) on December 2, 2015 "on a voluntary basis . . . . . . as a walk-in . . . complaining of . . . suicidal ideations . . . [and] . . . a plan to shoot himself." (Doc. 14, p. 585) Plaintiff represented that he had "guns in the home [but] his wife ha[d] promised to remove th[em] . . . ." (Doc. 14, p. 585) Plaintiff was observed to be in "no acute distress" and his "[m]ood and affect appear[ed] normal." (Doc. 14, p. 586) Plaintiff was "admitted to the service of Dr. Rakesh Amin, M.D., for psychiatric evaluation and treatment." (Doc. 14, p. 586) Dr. Rakesh performed a mental status examination on December 3, 2015 which, apart from plaintiff representing that he experienced audible hallucinations and suicidal ideations, the results of the examination were otherwise unremarkable. (Doc. 14, pp. 588-90) Plaintiff was discharged

6

on December 9, 2015 "in a stable and improved condition."[13]  (Doc. 14, p. 592)

The June 13, 2016 clinical evaluation of Dr. Joe Bean, Ph.D., is before the court.  (Doc. 14, pp. 714-16)  Plaintiff "was referred" to Dr. Bean by attorney Stewart "to determine plaintiff's psychological eligibility for disability."  (Doc. 14, p. 714)  Dr. Bean diagnosed plaintiff with "Bipolar II Disorder with moderate anxious distress" pursuant to what Dr. Bean characterized as an "interview."  (Doc. 14, pp. 714-15)

Dr. Bean completed a Mental Impairment Questionnaire June 23, 2016.  (Doc. 14, pp. 717-23)  Dr. Bean opined that plaintiff had fair to poor or no mental ability or aptitude to do unskilled work, fair to poor or no mental ability or aptitude to do semiskilled and skilled work, fair to poor or no mental ability or aptitude to do particular types of jobs, and that he had marked limitations in activities of daily living and maintaining social functioning, constant limitations in concentration, persistence or pace, and continual episodes of deterioration or decompensation in work or work like settings."  (Doc. 14, ¶¶ 14.b, 15, pp. 720-22)

The medical records of Dr. Richard Fishbein, M.D., are before the court for June 21, August 8, and September 13, 2016.  (Doc. 14, pp. 724-27)  Dr. Fishbein completed a medical source statement (MSS) on September 13, 2016 (Doc. 14, pp. 728-34) in which he opined that plaintiff could: 1)  lift and carry up to 20 lbs. occasionally but never more than 20 lbs.  (Doc. 14,¶ I, p. 729); 2) sit 1 hr., stand 30 mins., and walk 30 mins. without interruption and that he could sit 4 hrs., stand 2 hrs., and walk 1 hr. total in an 8-hour workday (Doc. 14, ¶ II, p. 730); 3) reach overhead with his right hand occasionally, but never with his left hand, that he could reach in all directions, push and pull occasionally, handle finger and feel frequently, and that he could operate foot controls

---

[13]  Plaintiff presented to TrustPoint again on September 8, 2017 (Doc. 14, pp. 32-35) after the ALJ entered his unfavorable decision and prior to his August 10, 2017 request that the Appeals Counsel review the ALJ's decision.  This evidence was not before the ALJ at the time he entered his unfavorable decision.

7

occasionally with either foot (Doc. 14, ¶¶ III-IV, p. 731); 4) climb stairs and ramps and balance occasionally, but never climb ladders or scaffolds, stoop, kneel, crouch, or crawl (Doc. 14, ¶ V, p. 732); 5) occasionally operate a motor vehicle, tolerate humidity and wetness, dust, odors, fumes, pulmonary irritants and vibrations, but never unprotected heights, moving mechanical parts, extreme cold or heat, and only moderate noise (Doc. 14, ¶ VII, p. 733); 6) not travel without a companion for assistance, or walk a block at a reasonable pace on rough or uneven surfaces, but that he had no other ADL limitations (Doc. 14, ¶ VIII, p. 734).

### B. Other Documentary Evidence

The September 19, 2017 deposition of Dr. Bean is before the court. (Doc. 14, pp. 8-18) Dr. Bean's deposition, taken approximately three months after the ALJ entered his unfavorable decision, was filed on appeal from the ALJ's decision. The August 10, 2017 deposition of Dr. Fishbein (Doc. 14, pp. 39-56) is before the court as well. Dr. Fishbein's deposition, taken two months after the ALJ entered his unfavorable decision, also was filed on appeal from the ALJ's decision.

### III. ANALYSIS

### A. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's

8

RFC and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374. Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2003). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence supports a different conclusion. *Gayheart*, 710 F.3d at 374.

### B. Claims of Error

### 1. Whether the ALJ Stated the Facts Correctly in His Decision
### (Doc. 19, ¶ 1, pp. 8-15)

Plaintiff asserts that "there were a number of conclusions drawn by the Administrative Law Judge that did not have sufficient evidentiary development at the hearing, or have other evidence in the record to support the conclusion regarding to Plaintiff's limitations." (Doc. 19, p. 9) As noted above, the ALJ's determinations must be supported by substantial evidence.

Plaintiff argues first that there is "[s]cant evidence in the record" to support the ALJ's conclusions that plaintiff had the ability to "plan and make purchases" based on the fact that he shopped for groceries, that he "demonstrate[d] his ability" to go out because he was able to drive alone, and that his "ability to prepare simple meals and do light chores demonstrate[d] his ability to understand and plan for such activities." (Doc. 19, p. 9) Plaintiff also argues that there was "[v]ery little . . . questioning at the hearing [that] supports these conclusions." (Doc. 19, p. 9)

The conclusions at issue pertain to ADLs to which the ALJ referred in determining that plaintiff did not satisfy the "paragraph B" criteria of listings 12.04 (Depressive, bipolar and related

9

disorders), 12.06 (Anxiety and obsessive-compulsive disorders), and listing 12.15 (Trauma and stressor-related disorders). (Doc. 14, p. 96)  The evidence of record that supports the ALJ's conclusions is provided in part in the August 7, 2015 Adult Function Report that plaintiff completed attesting to his ability to perform the ADLs cited, *i.e.*, shopping, driving, preparing meals and doing light chores. (Doc. 14, pp. 256-60, § B.6, ¶¶ 13.a, 14-15, 16.a-b, 19.b) As discussed above at p. 5, the records of Dr. Holmes' for the period March 2013 to May 2016 show that plaintiff was managing his ADLs without significant difficulty.  As discussed above at p. 6, Dr. Dubois determined in November 2015 that plaintiff only had mild ADL limitations. (Doc. 14, p. 151)  Finally, as discussed above at p. 5, the records of Pain Management Services noted repeatedly during 2015 and 2016 that plaintiff's ADLs' were improved with medication.  The foregoing constitutes substantial evidence to support the conclusions at issue.

As for the argument that there was "[v]ery little . . . questioning at the hearing" to support the ALJ's "assessments," plaintiff's  argument appears to be that the ALJ failed to question him about either the conclusions at issue or his testimony pertaining to other "self described limitations." An ALJ does not have a duty to develop the record by asking questions where, as here, a claimant is represented by counsel at the hearing. *See Bass v. McMahon*, 499 F.3d 506, 514 (6th Cir. 2007); *see also Culp v. Comm'r of Soc. Sec.*, 529 Fed.Appx. 750, 751 (6th Cir. 2013).

Plaintiff argues next that he "does not handle stress well" and that his "self-described limitations" raised at the hearing "are well supported in other portions of the record." (Doc. 19, p. 10)  Plaintiff provides no factual allegations to support this argument.  The district court is not obligated on judicial review to supply factual allegations in support of claims where no facts are alleged. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006)("[W]e decline to formulate arguments on [appellant's] behalf"); *Moore v. Comm'r of Soc. Sec.*, 573 Fed.Appx. 540, 543 (6th Cir. 2014)(citing *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir.

10

2010)("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). This argument is waived.

Plaintiff argues next that the Pain Management Services October 17, 2005 intake evaluation contained a diagnosis of anxiety (Doc. 14, p. 520), that the Pain Management Services' records are "replete" with references to his anxiety, that the medications prescribed by Pain Management Services are "well known prescription drugs to treat anxiety . . . which can cause, among other things, some measure of confusion and drowsiness." (Doc. 19, pp. 10-11) Plaintiff asserts further that he has been prescribed "various oral pain medications" all of which have "sleepiness and confusion" as a "common side effect." Plaintiff argues further that "[n]o reasonable person could reach a conclusion that there were no limitations . . . [on his] ability to function given the various medications he was prescribed to manage . . . [his] . . . pain and his anxiety." (Doc. 19, p. 11)

The October 2005 intake evaluation to which plaintiff refers predated the disability onset date by more than two and one-half years. Evidence that predates the alleged disability onset date, while not necessarily irrelevant, may be "evaluated *in combination with later evidence*" to help establish disability in cases involving a progressive condition." *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed.Appx. 411, 414 (6th Cir. 2006)(italics in the original). The October 2005 intake evaluation was for low back pain. Therefore, it is not relevant to plaintiff's alleged limitations due to anxiety. Moreover, Dr. Harmuth, who completed the intake evaluation, was not a mental health professional – he was an anesthesiologist. The ALJ does not err in giving an opinion no weight where a medical source offers an opinion outside of his area expertise. *See Gant v. Comm'r of Soc. Sec.*, 372 Fed.Appx. 582, 584-85 (6th Cir. 2010); *Adams v. Massanari*, 55 Fed.Appx. 279, 284 (6th Cir. 2003).

Plaintiff's "no reasonable person" argument is unavailing. The evidence before the court regarding the effect of plaintiff's medications is as follows. First, plaintiff checked the box labeled

11

"No" in the Adult Function Report dated September 7, 2015 in response to the question, "do any of your medicines cause side effects." (Doc. 14, p. 263) Second, the Social Security disability reports before the court dated September 15, 2015 and December 30, 2015 show that plaintiff described the side effects of all his medication as "n/a' or "none." (Doc. 14, pp. 270, 283) Third, Dr. Holmes noted in virtually all of his treatment from February 2013 to May 2016 that plaintiff experienced no significant side effects from his medication (Doc. 14, pp. 388, 390-91, 393, 415-16, 418, 420, 600, 602-04, 606-14, 618-19), and the vast majority of the Pain Management Services' records show no adverse medication side effects (Doc. 14, pp. 482, 485, 487, 489-91, 493, 496, 498, 500, 502, 504, 506-07, 509, 511, 513, 515-16). In addition to the foregoing, the only reference in the record to plaintiff exhibiting "confusion" is in the April 13, 2015 clinical record in which Dr. Capps reported that plaintiff experienced "postical"[14] confusion following a seizure two months earlier after he stopped taking one of his prescription medications. (Doc. 14, pp. 736-37) As for "drowsiness," the only place that "drowsiness" is mentioned as a medication side effect is in the January 3, 2011 Pain Management Services record in which plaintiff checked the space adjacent to "sleepiness" just prior to his heart catheterization. (Doc. 14, p. 486)

Plaintiff argues next that the ALJ erred in the mental limitations set forth in the hypothetical to the VE. (Doc. 19, pp. 11-12) The offending part of the hypothetical is quoted below:

> [B]ecause of his conditions he would work better with things rather than people. He can respond appropriately to supervision, coworkers in work situations but contact with the public should not occur; contact with coworkers and supervisors can occur occasionally but only on a superficial job-related basis. He can respond appropriately to changes in a routine work setting infrequently as in less than occasional, which are slowly introduced . . . .

(Doc. 19, p. 11) Plaintiff argues that the evaluation upon which the excerpt quoted above was

---

[14] Postical – "occurring after a seizure . . . ." *Dorland's* at p. 1525.

12

"performed at a very early phase in this case," *i.e.*, in the Disability Determination Explanation upon reconsideration. Plaintiff also asserts that the hypothetical did not take into account limitations noted in the Disability Determination Explanation, and that the hypothetical did not take into account "relevant medical evidence . . . subsequently submitted in support of his claim." (Doc. 19, p. 12)

The excerpt from the hypothetical quoted above derives from Dr. Dubois' November 6, 2015 mental RFC analysis upon reconsideration which, in turn, was based on a review of the record as it existed at the time. (Doc. 14, pp. 152-54) The mere fact that Dr. Dubois' completed her assessment earlier rather than later in the proceedings below does not constitute *prima facie* proof that it is incorrect or otherwise unreliable, nor does plaintiff explain why he thinks it is.

Plaintiff asserts correctly that Dr. Dubois assessed plaintiff with the following specific limitations: 1) marked limitation in his ability to interact appropriately with the general public; 2) moderate limitation in his ability to accept instructions and respond appropriately to criticism from supervisors; 3) moderate limitation in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 4) moderate limitations in his ability to respond appropriately to changes in the work setting. (Doc. 14, p. 153) However, plaintiff neglects to mention that Dr. Dubois reconciled these four limitations as follows in determining that plaintiff was not disabled for mental reasons: "CL cannot interact effectively w/general public but can interact superficially w/coworkers & supervisors, will work better with things than with people within the restrictions applied above," and "CL can adapt to infrequent change within the restrictions applied above." (Doc. 14, pp. 153-54) Comparing Dr. Dubois' reconciliation of these four limitations with the offending part of the hypothetical quoted above at pp. 12-13 reveals that the ALJ took these specific limitations into account and that he applied Dr. Dubois' analysis correctly in formulating the part of the hypothetical at issue.

13

Plaintiff also argues that Dr. Dubois's assessment did not take "subsequently submitted" medical evidence into account, the inference being that the "subsequently submitted" medical evidence refuted Dr. Dubois assessment and, therefore, invalidates the hypothetical. Plaintiff makes no effort to identify the "subsequently submitted" medical evidence to which he refers, how that evidence refutes Dr. Dubois' assessment, or how it would have made a difference in the hypothetical to the VE and, therefore, to the outcome of the proceedings below. Again, plaintiff provides no factual allegations in support of this argument. Consequently, for the reasons explained above at pp. 10-11, this argument is waived.

Plaintiff argues next that "further proof" of Dr. Dubois's "error" is reflected in her report that plaintiff had a Global Assessment Function (GAF) score of 60-65, and that he had "some college." (Doc. 19, pp. 12-13) Plaintiff asserts that there is no evidence of either in the record and, indeed, the "11-29-12" report to which Dr. Dubois refers is not in the record. However, assuming for the sake of argument that Dr. Dubois erred in recounting the substance of the "11-29-12" report, the error is harmless unless it contributed to an erroneous hypothetical which, in turn, resulted in an improper disability determination. As shown below, it did neither.

Plaintiff's GAF score was not mentioned at the hearing. More particularly, the ALJ did not attribute any GAF score to plaintiff during the course of the hearing, nor was any GAF score included in the hypothetical to the VE. The GAF score of 60-65 at issue also did not find its way into the ALJ's decision. (Doc. 14, p. 99) As for plaintiff's education, the ALJ established at the hearing that plaintiff had "a 12th grade education," repeating that plaintiff had "a high school education" in his hypothetical to the VE, in response to which the VE testified that his testimony assumed that plaintiff had a high school education. (Doc. 14, pp. 111, 123, 126) As shown above, whether plaintiff had "some college" was not at issue at either the hearing or in the ALJ's decision.

Plaintiff refers next to Dr. Holmes' and Centerstone's clinical records to support his claim

14

that his anxiety is disabling. (Doc. 19, p. 13) The ALJ addressed Dr. Holmes' clinical records and determined that plaintiff had "improved with symptom stabilization following consistent treatment." (Doc. 14, p. 99) The ALJ's determination on this point is supported by the record. Although plaintiff represented subjectively on occasion to Dr. Holmes that he experienced anxiety (Doc. 14, pp. 388, 603), and although Dr. Holmes reported that plaintiff appeared anxious to varying degrees during the time he treated him (Doc. 14, pp. 388, 392-94, 603, 605, 611, 616-17), Dr. Holmes also reported repeatedly that plaintiff's anxiety was under "good" or " better control" with treatment (Doc. 14, pp. 389-93, 415-20, 602, 604, 606-14, 618-19) and, from an objective perspective, Dr. Holmes observed time and again that plaintiff exhibited no significant anxiety (Doc. 14, pp. 389-91, 415-20, 600, 602, 604, 606-10, 612-14, 618-19). Finally, Dr. Holmes noted the following on May 6, 2016, the last clinical record of Dr. Holmes in the record: "[a]nxiety symptoms are not a significant feature and panic episodes are not problematic" (Doc. 14, p. 600). As for Centerstone records, apart from LCSW Work's initial diagnosis of "Generalized anxiety disorder" (Doc. 14, p. 561), recurring references to managing anxiety as one of plaintiff's goals and objectives, and recurring references to the fact that he was making progress in that vein, plaintiff actually complained of anxiety only twice during the time he was treated at Centerstone, *i.e.*, June 8 and July 29, 2015 (Doc. 14, pp. 567, 570), although LCSW Work made no specific objective observation to that end during those two sessions. Apart from those two instances, both occurring the year before Dr. Holmes opined that "anxiety symptoms are not a significant feature, the Centerstone records are bereft of any clinical observations that plaintiff was suffering from anxiety

Plaintiff argues next that there are "numerous references to severe depression in the[] records." (Doc. 19, p. 13) Plaintiff refers to pages 25-35 of the administrative record, *i.e.*, the TrustPoint record of plaintiff's September 8, 2017 hospitalization for depression. As noted above at p. 7 n. 13, this record was not before the ALJ at the time of the hearing. Plaintiff refers to pages

15

414-20 of the administrative record. These are Dr. Holmes' clinical records for the period June 27 to November 21, 2013. There are no references to depression in these records. Plaintiff refers to pages 560-62, 564, 567, and 575 of the administrative record. Pages 560-62 are Centerstone's April 17, 2015 Clinical Intake Assessment in which LCSW Work diagnosed plaintiff with "Major Depression." However, LCSW Work's Intake diagnosis was based solely on plaintiff's subjective representation after attorney Stewart instructed plaintiff to seek treatment at Centerstone. "[A]n ALJ is not required to accept a claimant's subjective complaints. . . . ." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)(citations omitted). Pages 564, 567 and 575 are LCSW Work's progress notes for July 29 and September 11, 2015 when plaintiff represented subjectively on both dates that he had not made any progress to managing his depression. The record at p. 575 is the June 8, 2015 Care Plan crafted by LCSW Work. It merely repeated LCSW's April 17, 2015 Intake diagnosis based on plaintiff's subjective representations. Lastly, plaintiff refers to pp. 584-98 of the administrative record, which is the record pertaining to plaintiff's December 2, 2015 admission to TrustPoint "complaining of major depression with suicidal ideations." The admission diagnosis, based on plaintiff's subjective representations, was "[m]ajor depression, recurrent, severe with psychotic features," this despite plaintiff appearing in "no acute distress" and that his "[m]ood and affect appear[ed] normal" at the time. (Doc. 14, p. 586) Dr. Rakish's diagnosis was based on plaintiff's unremarkable mental status examination completed based on plaintiff's one-time subjective representations. (Doc. 14, p. 589)

Finally, plaintiff argues that the physical limitations in the hypothetical to the VE are not supported by the records of Pain Management Services. (Doc. 19, pp. 13-15) Plaintiff refers specifically to the length of time Pain Management treated him, the number of injections he received, imaging that showed degenerative spinal changes, and the initial intake in which Dr. Harmuth found that plaintiff had muscle weakness. The ALJ addressed these records in his decision,

but discounted them because of plaintiff's "continued conservative treatment for [his] back pain" (Doc. 14, p. 98), a conclusion supported by the record. Conservative treatment constitutes a good reason for discounting medical opinions. *See e.g., Kepke v. Comm'r of Soc. Sec.*, 636 Fed.Appx. 625, 631 (6th Cir. 2016)(citations omitted).

As shown above, the conclusions at issue are supported by substantial evidence. Consequently, plaintiff's first claim of error is without merit.

## 2. Whether the ALJ Erred in Not Presenting a Multiple-Impairments Hypothetical to the VE (Doc. 19, ¶ 2, pp. 15-19)

Plaintiff argues that the ALJ "failed to consider the combined effects of [his] multiple severe impairments" in his hypothetical. (Doc. 19, p. 15) Plaintiff asserts further that the ALJ failed to incorporate his "self-described limitations" into the hypothetical as well as information from the records of Pain Management Services, Centerstone, Dr. Holmes, TrustPoint, and Dr. Bean.

It is "well established an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Carrelli v. Comm'r of Soc. Sec.*, 390 Fed.Appx. 429, 438 (6th Cir. 2010)(citation omitted). "[A]lthough a hypothetical question need not incorporate a listing of the claimant's medical conditions, the vocational expert's testimony, to be reliable, must take into account the claimant's functional limitations, *i.e.*, what he or she 'can and cannot do,'" *Infantado v. Astrue*, 263 Fed.Appx. 469, 476 (6th Cir. 2008)(citations omitted), and must include those limitations that the ALJ deems to be severe, *see Griffith v. Comm'r of Soc. Sec.*, 582 Fed.Appx. 555, 565 (6th Cir. 2014)(citations omitted).

The ALJ determined that plaintiff had the following severe impairments: degenerative disc disease, coronary artery disease, and a panic disorder. (Doc. 14, p. 95) The hypothetical that the ALJ posed to the VE included the following:

17

> . . . this individual, because of his combined conditions, is limited to lifting 20 pounds occasionally, 10 pounds frequently; standing and walking about six of eight, sitting about six of eight; able to push and pull to the weights I've given; given posturals are occasional except for ladders, ropes and scaffolds which is never. He should avoid concentrated exposure to heat and cold and hazards. Further, because of his conditions, he would work better with things rather than people. He can respond appropriately to supervision, coworkers and work situations but contact with the public should not occur; contact with coworkers and supervisors can occur occasionally but only on a superficial of job-related basis. He can respond appropriately to changes in a routine work setting infrequently as in less than occasional, which are slowly introduced; are there jobs that the individual could perform?

(Doc. 14, p. 123) Although plaintiff's severe impairments are not listed as such, the limitations in that part of the hypothetical quoted above cover the impairments that the ALJ deemed severe, and the hypothetical explains what plaintiff can and cannot do. As for the records of Pain Management Services, Centerstone, Dr. Holmes, and TrustPoint, as well as his "self-described limitations," plaintiff's arguments here are essentially a rehash of those analyzed in his first claim of error above at pp. 9-17. As for Dr. Bean's opinion, the ALJ properly gave his "opinion little weight" as explained below in the analysis of plaintiff's third claim of error.

For the reasons explained above, plaintiff's second claim of error is without merit.

### 3. Whether the ALJ Erred in Rejecting Dr. Bean's Opinion
### (Doc. 19, ¶ 3, pp. 19-20)

Plaintiff asserts that the ALJ's "one sentence rejection of Dr. Bean's opinion" constitutes "reversible error." (Doc. 19, p. 19) More particularly, plaintiff argues that "there was no explanation, or any basis given why his opinion was rejected, except that it was inconsistent with the record as a whole."

The record shows that the ALJ wrote the following pertaining to Dr. Bean's opinion: "I find [Dr. Bean's] opinion to be inconsistent with the record as a whole. . . . . Further, this opinion was

given several years after the claimant's date last insured[15] and this opinion appears to be based on the claimant's subjective complaints. Therefore, I give this opinion little weight." (Doc. 14, p. 100) As shown above, the ALJ gave Dr. Bean's questionnaire "little weight" for three specific reasons: 1) because it was "inconsistent with the record as a whole"; 2) because the questionnaire was completed "after the claimant's date last insured"; 3) because it appeared to be based on the claimant's subjective representations.

Comparing and contrasting Dr. Bean's opinion with those records discussed in plaintiff's first claim of error, above at pp. 9-17, shows that Dr. Bean's opinions are not consistent with those records. The record also shows that Dr. Bean completed his questionnaire on June 23, 2016, nearly 2 and one-half years after plaintiff's last insured date. The ALJ is not required to include mental limitations in his consideration arising after the expiration of claimant's insured status. *See McIlroy v. Comm'r of Soc. Sec.*, 42 Fed.Appx. 738 (6th Cir. 2002). Finally, the record is clear on its face that Dr. Bean based his opinions on plaintiff's subjective representations made pursuant to a single "interview." As previously established, the ALJ is not required to accept plaintiff's subjective representations.

As for plaintiff's argument that the ALJ's explanation for giving Dr. Bean's opinion "little weight" constitutes "reversible error," the simple fact is that the ALJ's explanation is entirely adequate under SSA rules and regulations as explained below. The record shows that Dr. Bean is a nontreating, examining source. Whereas the opinions of a treating source generally are entitled to "controlling weight," the opinions of nontreating, examining sources such as Dr. Bean "are never assessed for 'controlling weight.'" *Gayheart*, 710 F.3d at 376-77 (quoting 20 C.F.R. § 404.1527(c)). Moreover, although the ALJ is required to provide "good reasons" for discounting the weight given

---

[15] Plaintiff's last insured date was December 31, 2013. (Doc. 14, p. 93)

to the opinion of a "treating source," *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)), the ALJ is not procedurally required to give "good reason" for the weight given to the opinion of a nontreating, examining source, *see Ealy v. Comm'r of Soc. Sec*, 594 F.3d 504, 514-15 (6ᵗʰ Cir. 2010).  Indeed, the ALJ is not required to explain his reasons for the weight he gives to the opinion of nontreating, examining sources.  *See Norris v. Comm'r. of Soc. Sec.*, 461 Fed.Appx. 433, 439 (6ᵗʰ Cir. 2012)("[A]n ALJ need only explain [hi]s reasons for rejecting a treating source statement because such an opinion carries 'controlling weight' under the SSA.")(citing *Smith v. Comm'r. of Soc. Sec.*, 482 F.3d 873, 876 (6ᵗʰ Cir. 2007)("[T]he SSA requires ALJs to give reasons for only *treating* sources." (italics for emphasis in the original)).

Plaintiff's third claim of error is without merit for the reasons explained above.

### 4. Whether the ALJ Erred in Not Considering the Medical Vocational Guidelines (Doc. 19, ¶ 4, pp. 20-22)

Plaintiff asserts that he is "entitled to a finding of 'disabled' on the record pursuant to . . . 20 CFR, Part 404, Subpart P., Appendix 1, Part A, Section 1.05(C) — 'Disorders of the spine' . . . ." (Doc. 19, p. 20)  Plaintiff also asserts that the ALJ "dismissed off hand the opinion of . . . evaluating physician "Dr. Fishbein and that he "did so without the appropriate analysis as required by applicable law."  (Doc. 19, p. 21)

As already noted above at p. 18, the ALJ determined that plaintiff had the following severe impairments: degenerative disc disease, coronary artery disease, and a panic disorder.  The ALJ wrote the following concerning those severe impairments in his step three analysis:

> Despite the claimant's severe impairments, I find the claimant has not satisfied the narrow definition of a listed impairment as set forth in Appendix 1, Part 404, Subpart P of Regulation No. 4 [Cardiovascular System], nor do the impairments equal in severity a listed impairment.  Therefore, a finding of conclusive disability cannot be reached at this step of the sequential evaluation and we must proceed

to the next step of the evaluation.

(Doc. 14, p. 96)

The record shows that counsel did not address the listing at issue at the hearing, nor was any evidence adduced at the hearing – or afterward – to satisfy the evidentiary requirements of listing 1.05(C). (Doc. 14, pp. 108-34) Under these circumstances, the ALJ was not required to discuss the listing at issue in his step three analysis. *See Wilson v. Comm'r of Soc. Sec.*, 618 Fed.Appx. 281, 286 (6th Cir. 2015)(citing *Malone v. Comm'r of Soc. Sec.*, 507 Fed.Appx. 470, 472 (6th Cir. 2012)(rejecting the claimant's assertion that the ALJ had to discuss a particular listing specifically where the claimant did not argue that he had a listed impairment at his administrative hearing)).

Turning to Dr. Fishbein, plaintiff argues that it is "well established that the assessment of residual functional capacity by a treating physician is given greater weight that the assessment of any consulting physician." (Doc. 19, p. 22) Plaintiff obviously is of the opinion that Dr. Fishbein is a treating source and, as such, his opinions are entitled to controlling weight. The SSA rules and regulations define "treating source" as follows:

> Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your conditions(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on you need to obtain a report in support of your claim for disability. In such case, we will consider the acceptable medical source to be a nontreating source.

21

20 C.F.R. § 404.1527(a)(2). The undersigned turns first to whether Dr. Fishbein is a treating source.

Dr. Fishbein is not listed as a medical professional who provided plaintiff with care in any of the SSA's several disability reports, or anywhere else in the SSA's record of evidence for that matter. (Doc. 14, pp. 245-51, 266-68, 270, 279-282) As discussed above at pp. 7-8, Dr. Fishbein examined plaintiff the first time on June 21, 2016 following which he examined plaintiff twice more – on August 8 and September 13, 2016 – before completing his MSS on September 13, 2016. Dr. Fishbein saw plaintiff for the first time nearly 2 and one-half years after plaintiff's last ensured date. As discussed more fully below, plaintiff testified at the hearing on April 5, 2017 that he continued to be treated by Pain Management Services for back pain (Doc. 14, p. 122) thereby establishing that he had been and continued to be receiving care from Pain Management Services continuously for more than eleven-plus years. Plaintiff also testified at the hearing that Dr. Basaraba continued to treat him for his heart condition establishing that he had been and continued to be receiving care from Dr. Basaraba continuously for six-plus years.

Dr. Fishbein couched the limitations in his MSS and his explanation of those limitations in terms of plaintiff's back and heart issues which, as shown above, plaintiff had been under other doctors' care for many years. Moreover, Dr. Fishbein's treatment plan on June 21, 2016 was to "[r]eturn in 2 months" (Doc. 14, p. 727), his treatment plan on September 13, 2016 was to "[c]ontinue pain management f/u w/cardiologist annually" (Doc. 14, p. 729), and his treatment plan on August 8, 2016 was to "[c]ontinue pain management f/u w/PCP for blood work – check for diabetes . . . Return" (Doc. 14, p. 726) In other words, Dr. Fishbein provided no actual back or heart-related treatment, but referred plaintiff instead to those who had provided him with medical care for those conditions for years.

As shown above, substantial evidence supports the conclusion that plaintiff sought out Dr. Fishbein for the sole purpose of obtaining a report to support his disability application.

Consequently, Dr. Fishbein is not a treating source under § 404.1527(a)(2), he is a nontreating, examining source whose opinion is not entitled to controlling weight.

The next question is whether the ALJ "dismissed off hand the opinion" of Dr. Fishbein "without the appropriate analysis as required by applicable law." The ALJ wrote the following in his decision pertaining to the MSS submitted by Dr. Fishbein:

> I find this opinion to be inconsistent with the record as a whole and with Dr. Fishbein's own findings (Exhibit 16F). Indeed, it appears that his opinion is based more on the claimant's subjective allegations than objective evidence. Further, Dr. Fishbein began evaluating the claimant several years after the claimant's date last insured. While I acknowledge that the claimant's physical impairments continued to impose some limitation on his ability to perform work activity, such limitations were not at a disabling level, as evidenced by Dr. Fishbein's objective findings. Therefore, I give this opinion little weight.

(Doc. 14, p. 99)

A plain reading of Dr. Fishbein's records reveals that there is no objective medical evidence in them that supports the limitations in his MSS. Indeed, a plain reading of those records supports the conclusion that Dr. Fishbein's recorded observations are based on plaintiff's subjective representations. As previously noted herein, an ALJ is not required to accept a claimant's subjective representations. The record also shows that Dr. Fishbein first examined plaintiff, and completed his MSS, nearly 2 and one-half years after plaintiff's last insured date. As discussed above at p. 19, the ALJ is not required to consider evidence that postdates a claimant's last insured date. As previously established above at pp. 19-20, the ALJ's explanation of the weight he gave Dr. Fishbein's opinion is absolutely sufficient for a nontreating, examining source.

Plaintiff's fourth claim of error is without merit for the reasons stated above.

## IV. CONCLUSION
## AND
## RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 18) be **DENIED** and the Commissioner's decision **AFFIRMED**.  The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein.  A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal.  *Thomas v. Arn*, 474 U.S. 140, 149, 155, *reh'g denied*, 474 U.S. 111 (1986); *see Berry v. Warden, Southern Ohio Correctional Facility*, 872 F.3d 329, 335 (6th Cir. 2017).

**ENTERED** this the 25th day of June, 2019.


/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge